# UNITED STATES DISTRICT COURT

for the
Eastern District of Wisconsin

In the Matter of the Search of:

https://www.facebook.com/profile.php?id=1373617493 )
Facebook Username: TJ O'Brien, )
Facebook User ID: 1373617493 )
)
)

Case No. 20-862M (NJ)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

See Attachment A

located in the Eastern District of Wisconsin, there is now concealed:

See Attachment B

The basis for the search under Fed. R. Crim P. 41(c) is:

- ■ evidence of a crime;
- ■ contraband, fruits of crime, or other items illegally possessed;
- ■ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of: 18 U.S.C. § 922(g), 18 U.S.C. § 924(c), 21 U.S.C. § 841

The application is based on these facts: See attached affidavit.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days:_____) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Special Agent Richard Connors, ATF
*Printed Name and Title*

Sworn to before me and signed in my presence:

Date: January 16, 2020

_____
*Judge's signature*

City and State: Milwaukee, Wisconsin _____ Honorable Nancy Joseph _____, U.S. Magistrate Judge

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Richard Connors, being first duly sworn, hereby depose and state as follows:

### I.    INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a search warrant for information associated with certain Facebook user IDs that are stored at premises owned, maintained, controlled, or operated by Facebook, a social networking company headquartered in Menlo Park, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook to disclose to the government records and other information in its possession, pertaining to the subscribers or customers associated with the user IDs.

2. It is believed that the information associated with the Facebook User IDs 1373617493 may contain evidence of violations of 18 U.S.C. § 922(g) (possession of firearm by prohibited person); 18 U.S.C. § 924(c) (use of a firearm during a federal drug/violent crime); and 22 U.S.C. § 841(a)(1). As a result, a request is submitted for a search warrant to review information associated with the aforementioned Facebook User IDs. The information to be searched is described in the following paragraphs and in Attachment A.

3. I am employed as a Special Agent with the United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) assigned to the

Milwaukee Field Office since October of 2015. I have been employed as a full time law enforcement officer for over 4 ½ years. I have received training at the Federal Law Enforcement Training Center in Glynco, GA. I attended the Criminal Investigator Training Program, as well as ATF's Special Agent Training Program. I have received training in the investigation of unlawful possession of firearms, the unlawful transfer of firearms, and the unlawful dealing in firearms without a dealers' license. Prior to becoming a Special Agent with the ATF, I received two (2) bachelor's degrees from Northern Illinois University in the fields of Sociology and International Relations. I have received a Master's degree from Northern Illinois University in the field of American Government.

4. I have received training in the investigation of firearms trafficking, and I work alongside several senior ATF agents who have worked extensive firearms trafficking investigations in the past. Based on my training, experience, and participation in firearms trafficking investigations, I know and/or have observed the following:

- I have utilized informants to investigate firearms trafficking. Through informant interviews and debriefings of individuals involved in firearms trafficking, I have learned about the manner in which individuals and organizations distribute firearms in Wisconsin;

- I have also relied on informants to obtain firearms from individuals on the streets (as opposed to licensed gun dealers), known as a controlled purchase;

- I have experience conducting street surveillance of individuals engaged in firearms trafficking. I have participated in the execution of numerous search warrants where firearms, ammunition, magazines, and firearms cases have been seized;

- I am familiar with the language utilized over the telephone to discuss firearms trafficking, and know that the language is often limited, guarded, and coded;

- I know that firearms traffickers often use electronic equipment, wireless and land-line telephones, and pagers to conduct firearms trafficking operations;

- I know that drug traffickers commonly have in their possession, and at their residences and other locations where they exercise dominion and control, firearms, ammunition, and records or receipts pertaining to such;

- I know that firearms traffickers often put their telephones in nominee names to distance themselves from telephones that are utilized to facilitate firearms trafficking;

- I know that firearms traffickers often use proceeds to purchase assets such as vehicles, property, jewelry, and narcotics. I also know that firearms traffickers often use nominees to purchase and/or title these assets to avoid scrutiny from law enforcement officials; and

- I know that firearms traffickers often use online firearms brokerage websites, such as "Armslist," to obtain firearms. I know that individuals who utilize "Armslist," will contact other users of the site regarding the sale of firearms via electronic mail (hereinafter referred to as EMAIL) and exchange phone numbers. Individuals then discuss price and meet up locations to exchange money for the firearms by phone. Individuals are not required to complete background checks through "Armslist," and individuals often do not check to see if the person to whom they are transferring the firearm is a convicted felon.

5. I have participated in several firearms trafficking investigations that involved the seizure of computers, cellular phones, cameras, and other digital storage devices, and the subsequent analysis of electronic data stored within these computers, cellular phones, cameras, and other digital storage devices. In many occasions, this electronic data has provided evidence of the crimes being investigated and corroborated information already known or suspected by law enforcement.

6. Furthermore, Affiant knows from training and experience it is common for drug users, drug dealers, firearms traffickers, and firearms straw purchasers to communicate via cellular phone through a variety of electronic media. It also common for firearm traffickers and straw buyers to communicate through cellular phones and electronic media. Many times drug dealers also act as firearms traffickers by utilizing the non-prohibited status (no felony convictions) of drug users to obtain firearms. In

turn, these firearms are used by the drug trafficking organization to protect and secure their goods and territory. The participants in these organizations can use text (SMS) messaging, phone calls, electronic mail, messaging applications, and various social media applications such as Facebook or Twitter.

7. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other investigators and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## II. ITEMS TO BE SEARCHED

8. The Facebook pages belonging to Timothy J. O'BRIEN, herein described as a personal website that is accessed with a username and password specific only to that page and further described in Attachment A. The following Facebook Page URL, Facebook Usernames, and associated Facebook Identifications Numbers:

- Facebook Username: TJ O'Brien, Facebook User ID: 1373617493, https://www.facebook.com/profile.php?id=1373617493

The applied-for warrant would authorize the search and recovery of evidence particularly described in Attachment B.

## III. PROBABLE CAUSE

### FACEBOOK REVIEW OF TIMOTHY O'BRIEN

9. On August 11, 2017, Affiant reviewed the publicly visible area of the Facebook page belonging to O'BRIEN (Facebook Username: TJ O'Brien, Facebook User ID: 1373617493). Affiant positively confirmed the identity of O'BRIEN by comparing

photographs located on the Facebook page to the Wisconsin DMV photograph on file for Timothy O'BRIEN (DOB 05/03/1989).

10. On June 20, 2016, O'BRIEN posted a photograph of what appears to be himself firing what appears to be a black rifle (unknown make, model, and caliber, with an object consistent in appearance with that of a sound suppressor attached to the barrel). In the comment section below the photograph, a subject with the Facebook Username "Aurele Hebert" asked in a post, "M4a1 with silencer? Lol." O'BRIEN responds "300 Blackout," and then posts, "With suppressor. Better back pressure for the round." It should be noted that "300 Blackout" is a type of rifle round designed for use with sound suppressed weapons.

11. On May 11, 2017, O'BRIEN posted a photo showing a black and silver motorcycle, and what appears to be a pistol (unknown make, model, and caliber, with a silver slide and a black composite frame) sitting on the seat. The photograph is captioned "Missed muh babies ;)". Facebook has a notation listing the location of the posting of the photograph as Kenosha, WI.

12. On September 20, 2017, Affiant obtained a Federal Search warrant for the content of the Facebook page "TJ O'Brien," with a corresponding Facebook ID of 1373617493. The Facebook report for the page "TJ O'Brien" covered the dates of 01/01/2015 through 09/20/2017.

13. Throughout the analysis of the Facebook page "TJ O'Brien", several posts were located discussing the sale and trade of firearms. The page "TJ O'Brien" also contains several conversations documenting the consumption and sale of marijuana.

14. Throughout the Facebook page "TJ O'Brien," there were approximately twenty-one (21) conversations detailing the sale and consumption of marijuana. These posts occurred between 06/02/2015 and 08/18/2017.

15. Throughout the Facebook Forensic report, there were multiple discussions for acquiring/sale and trade of firearms.

The conversation begins on page 15549, the profile "TJ O'Brien" added the page "Robert Tourtillott," on 07/15/2017 at 21:48. The page "Tj O'Brien" sent the below listed photos and then engaged in a conversation with "Robert Touttillott".









·Robert Toutillott: What's up?

·TJ O'Brien: Saw your post on the Cheesehead page

·Tj O'Brien: Still have the 23

·Robert Tourtillott: Yes I do

·TJ O'Brien: Are you open to trade or need cash?

·Robert Tourtillott: I am open to possible trades

·TJ O'Brien: That's an M&P CORE 9L Burris optic/3 MOA. Also have TLR-2S. Laser/Light/Strobe Combo

·TJ O'Brien: 5 inch barrel

·TJ O'Brien: Optic has 4 different settings

·TJ O'Brien: Little knife thing was just for fun.

·TJ O'Brien: But it does work lol

·TJ O'Brien: Optic also has transferable lifetime warranty

·TJ O'Brien: Also has apex trigger internals

·Robert Tourtillott: Nice gun what are you thinking

·TJ O'Brien: The one I saw was the 23 with the conversion you had with the holsters.

·Robert Tourtillott: Straight up trade or what?

·TJ O'Brien: Well with the conversion I see yours at about 600 market value in good condition, plus you have extra mags and the holsters which
aren't cheap. Mine is about 600-650 market value plus about a 250 optic and a 250 light/laser.

·TJ O'Brien: Figure I keep the TLR unless you have incentive or a counter offer

·TJ O'Brien: I only have 1 extra mag and a leather holster that doesn't fully cover trigger guard with optic but does when optic is off.

·TJ O'Brien: But it's a competition ready gun. Same one Jerry Miculek uses.

·Robert Tourtillott: I wouldn't need the light

·TJ O'Brien: Just got rid of a my Walther CCP and wanted something better for carry. I'm a fair guy too so I figure it's a fair trade that way. Maybe a little different but I'de rather trade with someone off a page than a random person.

·Robert Tourtillott: Where are you located? I am in Milwaukee near the airport

·TJ O'Brien: In Kenosha

·TJ O'Brien: My car has to go to the shop Monday too. Ball joint is coming loose so I am immobile until then.

·TJ O'Brien: Sorry, did you get that. I got disconnected.

·Robert Tourtillott: No I am tailgating at Miller Park

·TJ O'Brien: Oh okay, it said I got a video chat from you. Have fun at the game man. I have a bike too if you wanted to meet halfway. Or during the week works too.

Conversation between "TJ O'Brien" and "Joe Sparacino" on page 15650, dated 12/22/2016 at 00:04. Your affiant identified this individual as Joe Sparacino (W/M, DOB: 12/23/1989) of Chicago IL. Based upon the below conversation, it appears SPARACINO was contacting O'BRIEN in order to assist him in acquiring a handgun from a gun show in Wisconsin. This act alone is in violation of 18 U.S.C subsection 922 (a)(3)- bringing a firearm into the state of residence. If O'BRIEN purchased the firearm in WI and provided it to SPARACINO this is a violation of 18 U.S.C subsection 922 (a)(5)-transfer of a firearm to an out of state resident.

·Joe Sparacino: Hey so is that possible to do

·TJ O'Brien: When?

·Joe Sparacino: After new years when the holidays calm down maybe or I wouldn't mind it being under the tree for Christmas lol

·TJ O'Brien: I get back from Cancun on the 8th

·Joe Sparacino: Ya I saw your going on vacation

·Joe Sparacino: I can wait

·TJ O'Brien: And I'm sorry but gotta ask, even though its stupid even to. But the ATF didn't like talk to you or anything did they? Just saying ciz its outta the blue and curious why you would ask me. I would trust you of all people, but you know how it is.

·Joe Sparacino: No dude

·Joe Sparacino: You seem professional about it man

·Joe Sparacino: I know your in Wisconsin honestly thought it could be easier

·TJ O'Brien: I just don't know with my Dad sometimes you know. Haven't talked to him in years and he knows all different types of dudes across all agencies. Plus I just had the ATF at my door a month ago so I gotta ask.

·Joe Sparacino: I feel you bro

·TJ O'Brien: I have no reason not to trust you though dude.

·Joe Sparacino: That's wassup man

·TJ O'Brien: I mean, everything is legal either way but Chicago is kinda Nazi-ish and even if I had you come here they're still weird about shit.

·Joe Sparacino: Ya but I don't want any paper trail if possible

·TJ O'Brien: We'll go to a gun show together when I get back

·Joe Sparacino: I just want one honestly to have it with no tracing back to anything if something were to happen

·TJ O'Brien: Yeah man, I feel you. Even if your in the right you could get charged there. Better to have no evidence to ensure true freedom and safety of property.

·Joe Sparacino: I'm Italian you already know

·TJ O'Brien: You ever own a gun before or own any now?

·Joe Sparacino: No

·Joe Sparacino: My dad did

·Joe Sparacino: We went to the range a few times

·Joe Sparacino: I think it's here still but my mom won't touch it

·TJ O'Brien: You ever think of getting your CCW?

·Joe Sparacino: Ya

·Joe Sparacino: I'd carry a governer

·Joe Sparacino: Lol

·TJ O'Brien: Fuck that shit lol

·TJ O'Brien: .410 ain't shit bro and the recoil is ridiculous for that much projection of force.

·TJ O'Brien: Lol fun as fuck though

·Joe Sparacino: True

·TJ O'Brien: Plus, in the house, its so loud. Your not gonna have plugs. First shot and your gonna be dealing with a concussion ring for follow up shots.
·Joe Sparacino: You ain't
·Joe Sparacino: Lying
·TJ O'Brien: I'm not a cocky dude any more but I know my shit about firearms and how to use them. And if I don't know about a particular firearm, I'll say it. But function and practice is mostly universal.
·Joe Sparacino: Yup

16. Your affiant reviewed a comment the profile "TJ O'Brien", made in reference to his interview with ATF. On November 18, 2016, the profile "TJ O'Brien" engaged in a conversation with "Anthony Sorrentino". The profile "TJ O'Brien" stated, "Morally, it sucks a little. Never buying a in my name again unless its something I'm keeping forever that's high dollar. But at the end of the day, if someone wants one, they're gonna get it." On 12/15/2016, the profile "TJ O'Brien" engaged in a conversation with the page "Joe Sparacino". The pair discuss getting SPARACINO a firearm without his name on it. Also in the conversation, the profile "TJ O'Brien" states to "Joe Sparacino", "I should have my other one back so that should be cool. Plus I'm going on a spending spree soon to build the arsenal back up lol".

## CONTROLLED PURCHASES

17. During the investigation we have conducted multiple "controlled buys." Based on my training and experience, I know a "controlled buy" is a law enforcement operation in which an informant purchases drugs, firearms or other items from a target. The operation is conducted using surveillance, usually audio and video taping equipment, and pre-recorded purchase money. When an informant is used, s/he is

searched for contraband, weapons, and money before the operation. The informant is also wired with a concealed body recorder and/or a monitoring device. When the transaction is completed, the informant meets cases agents at a pre-determined meet location and gives the purchased drugs, firearms or other purchased items and the recording/monitoring equipment to the case agents. The informant is again searched for contraband, weapons, and money and then interviewed by the case agents about the transaction. A sample of the suspected drugs is then field tested by the case agents for the presence of controlled substances and then placed in inventory pursuant to normal inventory procedures. Ideally, all of the calls to the target by the informants are consensually recorded calls under the direction and control of case agents and made in the presence or direction of case agents. Additionally, case agents typically observe the informants dial the target's number on each occasion. On occasion, it is not feasible or safe to record and monitor a telephone call made to a target. Typically, these unrecorded calls are last minute adjustments or very short calls to indicate arrival, departure or other less significant issues. Unless otherwise noted, the controlled buys and telephone contacts summarized below were conducted pursuant to the above procedures. The controlled buys conducted with OBRIEN are outlined below.

18. Beginning in June 2018, the affiant interviewed an ATF Confidential Informant (herein referred to as "CI") regarding OBRIEN. The CI was shown a photograph of OBRIEN from WI Department of Transportation Driver's License # O165-8108-91-6306 (image date: 05/11/2017). The CI positively identified the individual in the photograph as "TJ" (Facebook name of Timothy OBRIEN) the individual he/she

knew to sell marijuana. Additionally, the CI stated he/she believed he sold the male in the photograph a firearm.

19. For several reasons, case agents believe that the CI is reliable and credible. First, CI has been providing continuous information since June 2018. Second, the information provided by CI is consistent with evidence obtained elsewhere in this investigation where CI was not utilized, and substantial portions of CI's information have been corroborated through independent investigation, including surveillance and information from other sources. Third, the CI has made statements to case agents that are against his/her penal interests, in that the CI has admitted his/her involvement in the sale of firearms and narcotics in the past. Finally, the CI has had an adequate opportunity to observe directly the events discussed and/or has heard conversations directly from the individuals discussed herein. The CI is cooperating in exchange for credit in an ongoing investigation in which he/she is a suspect. The CI utilized in this investigation has no known criminal convictions. Investigators when possible independently corroborated information provided by the CI. Whenever possible text messages between the CI and OBRIEN were monitored, recorded and documented by agents. All meetings between the CI and OBRIEN were monitored, recorded and documented by agents.

20. Your affiant is aware of three controlled purchases conducted from Timothy OBRIEN. All of the below controlled buys were arranged via OBRIEN's Facebook account. The account can be identified by Facebook name "TJ Obrien", Facebook ID # 1373617493, with a URL of

https://www.facebook.com/profile.php?id=1373617493&epa=SEARCH_BOX. The CI would contact OBRIEN via OBRIEN's Facebook messenger to coordinate the amounts of marijuana to be purchased, total price for the drugs, and location for the drug deal. Facebook messenger can be accessed through a variety of electronic devices, including cellphones and computers.

21. In October 2018, the ATF Milwaukee Field Office conducted a controlled purchase of suspected marijuana from Timothy OBRIEN. On that day, the ATF CI purchased fourteen (14) grams of green leafy substance from OBRIEN for $180.00. The substance field tested positive for the presence of THC. The purchase occurred at OBRIEN's former residence located at 6848 29th Avenue, Kenosha, WI. An ATF undercover agent observed OBRIEN meet with the CI in the front of the residence and immediately recognized OBRIEN and later identified OBRIEN from observing state of Wisconsin Department of Transportation photographs.

22. In March 2019, the ATF CI conducted a controlled purchase from OBRIEN. The purchase occurred out front of OBRIEN's residence located at 6848 29th Avenue, Kenosha, WI. On that day, the ATF CI purchased seven (7) grams of suspected marijuana for $80.00. An ATF undercover agent observed OBRIEN meet with the CI. The green leafy substance field tested positive for the presence of THC. During the interaction, OBRIEN made several statements referring that he was a "gun guy." All statements were video and audio recorded.

23. During the week of January 13, 2020, the ATF CI conducted a controlled purchase from OBRIEN. OBRIEN instructed the CI to 9022 25th Avenue, Kenosha, WI,

once he/she arrived OBRIEN instructed the CI to enter the residence. At that location, OBRIEN sold the CI 14.1 grams of suspected marijuana for $140.00. OBRIEN's marijuana and a firearm were stored inside of the residence. The green leafy substance field tested positive for the presence of THC. During the interaction, OBRIEN displayed an AR-15 style rifle to the CI. Additionally, OBRIEN made several comments about the effectiveness of the marijuana and how it would make one feel, indicating he is a user of marijuana. An ATF undercover agent observed OBRIEN at the door of this residence. OBRIEN indicated he moved into the residence in the summer of 2019.

## GENERAL FACEBOOK INFORMATION

24. Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

25. Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

26. Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

27. Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

28. Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's

time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

29. Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

30. Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook. These chat communications are stored in the chat history for the account. Facebook also has a

Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

31. If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

32. Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

33. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

34. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

35. Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

36. The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized message can be attached to each gift. Facebook users can also send each

other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

37. Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

38. In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

39. Some Facebook pages are affiliated with groups of users, rather than one individual user. Membership in the group is monitored and regulated by the administrator or head of the group, who can invite new members and reject or accept requests by users to enter. Facebook can identify all users who are currently registered to a particular group and can identify the administrator and/or creator of the group. Facebook uses the term "Group Contact Info" to describe the contact information for the group's creator and/or administrator, as well as a PDF of the current status of the group profile page.

40. Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following information from the user's profile: profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and

networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

41. Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

42. Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

43. As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's "Neoprint," IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account

owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

44. Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## INFORMATION TO BE SEARCHED AND ITEMS TO BE SEIZED

45. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

46. Based on the forgoing, I request that the Court issue the proposed search warrant. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court of the Eastern District of Wisconsin is a district court

of the United States that has jurisdiction over the offense(s) being investigated, 18 U.S.C. § 2711(3)(A)(i). Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

## ATTACHMENT A

### Property to Be Searched:

This warrant applies to information between September 21, 2017 and present date associated with the following Facebook page:

- https://www.facebook.com/profile.php?id=1373617493
  Facebook Username: TJ O'Brien, Facebook User ID: 1373617493.

## ATTACHMENT B

### Particular items to be Seized

**I.     Information to be disclosed by Facebook**

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook, including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each user ID listed in Attachment A:

1.     All contact and personal identifying information, including: full name, user identification number, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

2.     All activity logs for the account and all other documents showing the user's posts and other Facebook activities;

3.     All photos uploaded by that user ID and all photos uploaded by any user that have that user tagged in them;

4.     All profile information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of

which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

5.      All other records of communications and messages made or received by the user, including all private messages, chat history, video calling history, and pending "Friend" requests;

6.      All "check ins" and other location information;

7.      All IP logs, including all records of the IP addresses that logged into the account;

8.      All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

9.      All information about the Facebook pages that the account is or was a "fan" of;

10.     All past and present lists of friends created by the account;

11.     All records of Facebook searches performed by the account;

12.     All information about the user's access and use of Facebook Marketplace;

13.     The types of service utilized by the user;

14.     The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

15.     All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

16.     All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

## II.     Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of 18 U.S.C. § 922(g) (possession of firearm by prohibited person); 18 U.S.C. § 924(c) (use of a firearm during a federal drug/violent crime); and 22 U.S.C. § 841(a)(1), since September 21, 2017, for each user ID identified on Attachment A, information pertaining to the following matters:

1.     The relevant offense conduct, any preparatory steps taken in furtherance of the scheme, communications between O'Brien and others related to the relevant offense conduct of firearms trafficking;

2.     Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

3.     Evidence indicating the Facebook account owner's state of mind as it relates to the crimes under investigation;

4.     The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

5.      The identity of the person(s) who communicated with the user ID about matters relating to relevant offense conduct of Title 18, United States Code, 922(a)(6) (any person in acquisition of any firearm knowingly furnish a false written or oral statement intended to deceive the dealer), Title 18, United States Code, 922(d) (sale or transfer of firearm to a prohibited person), and Title 18, United States Code, 922(g) (possession of a firearm by a prohibited person), including records that help reveal their whereabouts.